**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 20-1540
_____

VICKIE THORNE,
INDIVIDUALLY AND ON BEHALF
OF ALL OTHERS SIMILARLY SITUATED,
                                        Appellant

v.

PEP BOYS MANNY MOE & JACK INC.
_____

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. No. 2:19-cv-00393)
District Judge: Honorable J. Curtis Joyner
_____

Argued September 22, 2020

Before: SMITH, *Chief Judge,* McKEE, and JORDAN,
*Circuit Judges*

(Filed: November 20, 2020)

Yifei Li
Brenden S. Thompson
Alexandra C. Warren
Cuneo Gilbert & LaDuca
4725 Wisconsin Avenue, NW
Suite 200
Washington, DC  20016

Robert K. Shelquist                    **[ARGUED]**
Lockridge Grindal Nauen
100 Washington Avenue South
Suite 2200
Minneapolis, MN  55401
        *Counsel for Appellant*

Kristen E. Dennison
C. Scott Toomey                    **[ARGUED]**
Littleton Park Joyce Ughetta & Kelly
201 King of Prussia Road
Suite 220
Radnor, PA  19087
        *Counsel for Appellee*

————————————

OPINION OF THE COURT

————————————

SMITH, *Chief Judge.*

However appropriate may have been Virginia Woolf's comparison of the unhappy Mrs. Dalloway to "a wheel without a tyre," Plaintiff Vickie Thorne considers *herself* aggrieved

2

despite having equipped her car with two new tires.[1]  Wheels are not an issue.  What is at issue is a federal regulation that requires a tire dealer to help customers register their new tires with the manufacturer.  That regulation was promulgated under the National Traffic and Motor Vehicle Safety Act of 1966, 49 U.S.C. § 30101, *et seq.* ("the Act"), and the Act's stated purpose is to reduce traffic accidents and their consequent human toll.  Thorne's appeal turns on whether she can sue her tire dealer for ignoring its regulatory tire registration obligation.

The regulation prescribes three methods for tire dealers like Pep Boys Manny Moe & Jack Inc. to help register a buyer's tires.  According to Thorne, Pep Boys failed to pursue any of the three when, or after, it sold her the tires.  So she sued on behalf of a class of Pep Boys customers who similarly received no tire registration assistance.  But Thorne's suit skidded to a halt when the District Court dismissed her complaint without leave to amend.  The Court held that a dealer's failure to help register a buyer's tires in one of the three prescribed ways does not, by itself, create an injury in fact for purposes of Article III standing.  We agree with that *ratio decidendi* but, because a district court has no jurisdiction to rule on the merits when a plaintiff lacks standing, we will vacate and remand for the District Court to dismiss Thorne's operative complaint without prejudice.

## I. BACKGROUND

Congress passed the Act to "reduce traffic accidents and deaths and injuries resulting from traffic accidents."  49 U.S.C. § 30101; 80 Stat. 718.  Congress later amended the Act to

---

[1] Virginia Woolf, Mrs Dalloway 112 (Hogarth Press 1925).

require that every tire dealer unaffiliated with a tire manufacturer "give a registration form (containing the tire identification number) to the first purchaser of a tire."[2]  49 U.S.C. § 30117(b)(2)(B).  It also required a rulemaking to obligate dealers to keep certain records on tire sales, including each buyer's name and address and tire identification information. *Id.* § 30117(b)(3).  Rulemaking merged these two requirements, providing three options for tire dealers to comply with their registration obligations:

> (1) Give each buyer a registration form listing the tire identification number ("TIN") of each tire he or she bought and certain contact information of the dealer, for the buyer to then submit to the tire manufacturer;

> (2) Record each buyer's name and address, the TIN of each tire he or she bought, and certain contact information for the dealer on a registration form, and mail it to the tire manufacturer at no charge to the buyer within 30 days; or

> (3) Electronically submit to the tire manufacturer, by methods it has authorized, the same information in (2) at no charge to the buyer within 30 days.

*See* 49 C.F.R. § 574.8(a)(1)(i)–(iii).

Widening the lens, the Act states how it interacts with other laws and is enforced.  It preserves common-law causes

---

[2] We refer in this opinion to such unaffiliated dealers as simply "dealers."  For purposes not relevant here, the statute distinguishes between "independent dealers" such as Pep Boys and those affiliated with tire manufacturers.

of action, 49 U.S.C. § 30103(e), but does not confer an express private right of action. *See, e.g.*, *Ayres v. Gen. Motors Corp.*, 234 F.3d 514, 522–24 (11th Cir. 2000); *Mulholland v. Subaru of Am., Inc.*, 620 F. Supp. 2d 1261, 1265–66 (D. Colo. 2009). For administrative enforcement, the Act authorizes the Secretary of Transportation to decide whether a vehicle or vehicle equipment contains a safety-related defect or does not comply with minimum performance standards. *See* 49 U.S.C. §§ 30102(a)(10), 30118(a). Manufacturers must notify vehicle owners and dealers of any such defect or non-compliance, and the Secretary may *sua sponte* or on petition of an "interested person" hold a hearing on the sufficiency of notice. *Id.* § 30118(b), (e). "Interested person[s]" may participate in these hearings. *Id.* The Attorney General may also enforce the Act through a federal civil lawsuit to enjoin "a violation of this chapter or a regulation prescribed . . . under this chapter." *Id.* § 30163(a). One who violates the Act, including the tire registration statute (§ 30117) "or a regulation prescribed thereunder, is liable to the United States Government for a civil penalty of not more than $21,000 for each violation." *Id.* § 30165(a)(1). Penalties for "a related series of violations" can reach $105 million. *Id.*

## II.     FACTS AND PROCEDURAL HISTORY

Thorne bought two tires from a Pep Boys store in Richmond, Virginia, in January of 2017. She claims that Pep Boys did not help register her tires with the manufacturer using any of the three prescribed methods.[3]

---

[3] Thorne did not specifically allege in her complaint that Pep Boys disregarded Option 2, under which the dealer mails a buyer's completed registration form to the manufacturer. She

Thorne filed a class action complaint against Pep Boys in the Eastern District of Pennsylvania, alleging that Pep Boys violated its registration obligations under 49 C.F.R. § 574.8 and thus was liable to her on federal and state-law causes of action. Pep Boys moved to dismiss the complaint under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). The District Court determined that Thorne failed to allege a concrete injury in fact, dismissing her complaint without prejudice for lack of Article III standing.

Thorne then filed an amended class action complaint, bringing eight causes of action under federal warranty and state law.[4] She sought money damages, restitution, injunctive relief, and attorneys' fees. Pep Boys, she alleged, deprived her of the benefit of the bargain when it sold her tires without helping to register them because unregistered tires are worth less than registered tires. Thorne alternatively alleged intangible harm because her unregistered tires increase the risk to her person or property if she is unreachable upon her tires' recall. She did

alleged that she "was not handed a tire-registration form by Pep Boys," and her "invoice [did not] indicate that Pep Boys transmitted the federally-required information directly to the tire manufacturer." Am. Class Act. Compl. ¶ 53. She generally alleged that Pep Boys violated its registration obligations and that her tires went unregistered, so we take her to be claiming that Pep Boys did not perform Option 2 either. For purposes of this appeal, Pep Boys does not claim to practice any of the three tire registration methods.

[4] Thorne's operative complaint seems to implicate Federal Rules of Civil Procedure 23(b)(2) or 23(b)(3), though it cites neither.

not allege any performance problems, physical defects, or recall associated with her tires.

After Pep Boys again moved to dismiss, the District Court dismissed Thorne's amended complaint on Article III standing grounds. The District Court held that Thorne failed to sufficiently plead tangible financial harm because, as a matter of law, she did not bargain for compliance with the registration regulation. It also concluded that her alleged intangible harm was speculative and insufficiently concrete absent a recall of her tires. Citing *Kamal v. J. Crew Grp., Inc.*, 918 F.3d 102 (3d Cir. 2019), the District Court held that violation of 49 C.F.R. § 574.8's record-keeping requirement alone does not produce an injury in fact. This time, dismissal did not provide leave to amend.

### III. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291 to review the dismissal of Thorne's amended complaint. A North Carolina resident, Thorne invoked 28 U.S.C. § 1332(d) to ground the District Court's exercise of diversity jurisdiction over her putative class action against Philadelphia-based Pep Boys.

But the District Court lacked jurisdiction if Thorne couldn't establish Article III standing. *See In re Schering Plough Corp. Intron/Temodar Cons. Class Act.*, 678 F.3d 235, 243 (3d Cir. 2012). Constitutional standing, which is properly tested under Rule 12(b)(1), may be challenged facially or factually. A facial challenge argues that the plaintiff's factual allegations cannot meet the elements of standing. *Schering Plough*, 678 F.3d at 243; *see also In re Horizon Healthcare Servs. Inc. Data Breach Litig.*, 846 F.3d 625, 632 (3d Cir. 2017). Because that was the nub of Pep Boys's Rule 12(b)(1)

7

motion, we take Thorne's factual allegations as true, view them in her favor, and perform a plenary review of the dismissal. *See Horizon*, 846 F.3d at 632.

## IV.   ANALYSIS

Derived from separation-of-powers principles, the law of standing "serves to prevent the judicial process from being used to usurp the powers of the political branches." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013). Article III of our Constitution vests "[t]he judicial Power of the United States" in both the Supreme Court and "such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1. This "judicial [p]ower" extends only to "Cases" and "Controversies." *Id.* art. III, § 2; *see also Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). To assure that judges avoid rendering impermissible advisory opinions, parties seeking to invoke federal judicial power must first establish their standing to do so. *Spokeo*, 136 S. Ct. at 1547.

The familiar elements of Article III standing require a plaintiff to have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* at 1547. Injury in fact is the "'foremost' of standing's three elements"—and the one element at issue in this appeal. *Id.* (quoting *Steel Co. v. Citizens for Better Environment*, 523 U.S. 83, 103 (1998)). To plead an injury in fact, the party invoking federal jurisdiction must establish three sub-elements: first, the invasion of a legally protected interest; second, that the injury is both "concrete and particularized"; and third, that the injury is "actual or imminent, not conjectural or hypothetical." *Spokeo*, 136 S. Ct. at 1548 (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)); *see also Mielo v. Steak 'n*

8

*Shake Ops.*, 897 F.3d 467, 479 n.11 (3d Cir. 2018). The parties do not dispute that Thorne has suffered invasion of a legally protected interest, so our injury-in-fact analysis focuses on the latter sub-elements.

As the party invoking federal jurisdiction, Thorne has the burden to establish standing "for each type of relief sought." *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009); *see Finkelman v. Nat'l Football League*, 810 F.3d 187, 194 (3d Cir. 2016). Her arguments do not differentiate between the remedies she seeks. Still, we will consider her standing as to each remedy alleged, mindful of our task to "examine the allegations in the complaint from a number of different angles to see if [Thorne's] purported injury can be framed in a way that satisfies Article III." *See Mielo*, 897 F.3d at 479 (quoting *Finkelman*, 810 F.3d at 197).

### A. Tangible Economic Injury

A "paradigmatic form[]" of injury in fact is economic injury. *Danvers Motor Co., Inc. v. Ford Motor Co.*, 432 F.3d 286, 291 (3d Cir. 2005) (Alito, J.). "Standing always should exist to claim damages, unless perhaps the theory of damages is totally fanciful." *Id.* (quoting WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE, § 3531.4, at 847 n.7 (2005 Supp.)). Little surprise, then, that Thorne characterizes her tire purchase as an economic injury. But Thorne nowhere "allege[s] facts that would permit a factfinder to value the purported injury at something more than zero dollars without resorting to mere conjecture," *In re Johnson & Johnson Talcum Powder Prods. Litig.*, 903 F.3d 278, 285 (3d Cir. 2018), so she fails to plead a theory of economic harm sufficient to support standing.

9

The gravamen of Thorne's alleged economic injury is that she did not receive the benefit of her bargain when she bought tires from Pep Boys that then went unregistered. She alleged that "Class Members not only pay for the tires, but also pay the cost of Defendant's compliance with federal law." Am. Class Act. Compl. ¶ 9. And on appeal, she argues that "she paid Pep Boys for nondefective tires, and it instead provided her tires that were unregistered (because Pep Boys used none of the three mandated methods at the point of sale), and therefore the tires were defective, which is a tangible financial injury." Appellant's Br. 16. Thorne's benefit-of-the-bargain allegations do not support a viable theory of economic injury, and her product-defect argument blows right by the statute's defined terms.

1. *Unregistered tires not worth less than Thorne paid*. Thorne's benefit-of-the-bargain theory runs headlong into our case law. We start with *Johnson & Johnson*. There, the plaintiff claimed that when she bought baby powder, she was denied the benefit of her bargain because certain uses of the product "can lead" to an elevated risk of ovarian cancer. 903 F.3d at 281–82. Though the plaintiff might have expected "safe" baby powder, missing were allegations that the product was unsafe *as to her*, that she developed ovarian cancer, or that she was at risk of developing it as a result of using the baby powder. *Id.* at 289. We thus rejected the plaintiff's benefit-of-the-bargain theory of injury because she "failed to allege that the economic benefit she received from that powder was *anything* less than the price she paid." *Id.* at 290 (emphasis in original).

The same can be said for Thorne. Though she "pair[s] a conclusory assertion of money lost with a request that a defendant pay up," *Johnson & Johnson*, 903 F.3d at 288, that

doesn't suffice. Her pleadings concede that the tires she bought from Pep Boys are functioning as intended and haven't been recalled. Unalleged, uncertain future events do not make her Pep Boys tires worth less at the time of purchase than equivalent registered tires. *See id.* at 289–90. And Thorne's thin allegation that Pep Boys prices the cost of complying with the registration obligation into its tires is undermined elsewhere in her complaint. For example, she formulates a supposedly common class question as: "[w]hether Defendant includes the cost of tire-registration compliance in the price of its tires." Am. Class Act. Compl. ¶ 65(d). Given her mixed messages on compliance costs, Thorne fails to intelligibly allege that she paid for more than she received.[5]

Thorne's theory of economic harm also treads on *Finkelman*. As relevant here, Finkelman bought tickets to the Super Bowl in the resale market and then sued the NFL, alleging that he paid a higher price due to the NFL's practice of reserving nearly all tickets for teams and League insiders. 810 F.3d at 190–91, 199. We held that Finkelman's theory of economic injury stood on "nothing more than supposition" because we "ha[d] no way of knowing whether the NFL's withholding of tickets would have had the effect of increasing or decreasing prices on the secondary market." *Id.* at 200–01.

---

[5] As bedrock for her requested injunction, Thorne alleged that she "and the Class members will likely purchase tires from Defendant again . . . and still not receive the required tire-registration services." Am. Class Act. Compl. ¶ 134. We return to *Johnson & Johnson*: Thorne's desire to keep buying Pep Boys tires at prevailing prices makes it difficult to presume that she would pay more for registered tires. *See* 903 F.3d at 288–89.

11

For example, League insiders—who received their tickets for free—"might have been especially eager to resell their tickets," meaning that the NFL's practices may have effectively increased the supply and decreased the price of tickets in the resale market relative to a scenario in which the NFL sold more tickets to the public. *Id.* at 200.

Like Finkelman, Thorne propounds an economic injury that requires speculation about market or firm-level effects. Were Pep Boys to comply with its registration obligations, market factors might lead it to increase its tire prices accordingly. As Thorne recognizes, the submission-by-buyer method of compliance (Option 1) does not prohibit dealers from passing on registration costs to tire buyers. On the other hand, demand might be too elastic for Pep Boys to do so. We simply have no way of knowing. Rather than "application of basic economic logic," Thorne's theory of economic harm relies on "pure conjecture" about what Pep Boys's prices would be if it "sold its [tires] differently." *See Finkelman*, 810 F.3d at 201 (quotation omitted).

We recognize that one out-of-Circuit district court decision goes the other way. In *Exum v. National Tire & Battery*, 437 F. Supp. 3d 1141 (S.D. Fla. Jan. 28, 2020), a federal magistrate judge reasoned that purchasers of unregistered tires "have arguably purchased a less valuable product" and "can reasonably expect that the purchase price for those tires includes proper tire registration."[6] *Id.* at 1151–52. *Exum* is

---

[6] The judge in *Exum* declined to follow the District Court's dismissal of Thorne's original complaint based on "the specific allegations raised" in Exum's complaint. 437 F. Supp. 3d at 1152. But the judge noted that the cases are "similar." *Id.*

12

more properly considered an intangible harm case, and we will treat it as such. But it suffices here to note that *Exum* assigns economic value through mere conjecture, contrary to our Circuit's law. *See, e.g.*, *Johnson & Johnson*, 903 F.3d at 285; *Finkelman*, 810 F.3d at 201. At all events, Thorne alleges only that she generally expected, when buying the tires, to be "reachable" upon a recall, Am. Class Act. Compl. ¶ 55, not that she kicked the tires on the applicable regulations or was told at the point of sale that Pep Boys would take steps to help register the tires.[7] Lack of awareness of an affirmation at the time of purchase generally dooms a benefit-of-the-bargain theory of liability. *See, e.g.*, *Cipollone v. Liggett Grp., Inc.*, 893 F.2d 541, 566–68 (3d Cir. 1990) (applying New Jersey law)*, rev'd on other grounds,* 505 U.S. 504 (1992); *Gross v. Stryker Corp.*, 858 F. Supp. 2d 466, 501–02 (W.D. Pa. 2012) (applying Pennsylvania law). We decline to adopt *Exum*'s economic harm analysis here.

2. *Unregistered tires not defective*. Thorne also contends that we should presume suitable economic injury because an unregistered tire is per se defective under the Act. Interpreting the Act requires us to examine "the language itself, the specific context in which that language is used, and the broader context of the statute as a whole." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quotation omitted). Bearing these factors in mind, we conclude that Thorne's construction of the statute falls flat because it offends the statutory definition of "defect," relies on grammatically flawed readings of related definitions, and would create illogical results.

---

[7] Thorne has not alleged that Pep Boys lacks access to her contact information.

First, the Act's definition of "defect" cannot bear the weight Thorne places on it. When a statute defines a term, we must follow that definition and "exclude[] unstated meanings of that term." *Meese v. Keene*, 481 U.S. 465, 484 (1987) (citation omitted). The Act defines "defect" to mean "any defect in performance, construction, a component, or material of a motor vehicle or motor vehicle equipment." 49 U.S.C. § 30102(a)(3). The definition by its terms embraces faulty physical characteristics, not registration (*i.e.,* paperwork) deficiencies. Besides, other provisions of the Act suggest that non-compliance is not synonymous with defect. *See, e.g.*, 49 U.S.C. § 30118(b)(1) ("Secretary [of Transportation] may make a final decision that a motor vehicle or replacement equipment *contains a defect* related to motor vehicle safety *or does not comply with an applicable motor vehicle safety standard* prescribed [hereunder].") (emphases added); *id.* § 30116(a) ("If . . . it is decided that the vehicle or equipment *contains a defect* related to motor vehicle safety *or does not comply* with applicable motor vehicle safety standards . . . .") (emphases added). The definition of "defect" and other provisions' contemplation of that term seriously undermine Thorne's reading.

Second, we decline Thorne's invitation to contort other related definitions in the Act. According to Thorne, noncompliance can amount to a defect because:

> [A] defect in original equipment or non-compliance of original equipment with a motor vehicle safety standard prescribed under this chapter, is deemed to be a defect or non-compliance of the motor vehicle in or on which the equipment was installed at the time of delivery to the first purchaser.

14

49 U.S.C. § 30102(b)(1)(F); Appellant's Br. 18. "[O]riginal equipment means motor vehicle equipment (including a tire) installed in or on a motor vehicle at the time of delivery to the first purchaser." *Id*. § 30102(b)(1)(C). For one thing, the defined term "motor vehicle safety standard" means "a minimum standard for motor vehicle or motor vehicle equipment performance." *Id.* § 30102(a)(10). Thorne never explains how deficient registration amounts to a performance issue. For another, Thorne's contention that the "first purchaser" of original equipment can be the first purchaser of a tire violates the last-antecedent rule. *See, e.g.*, *Jama v. Immigr. & Customs Enf't*, 543 U.S. 335, 343 (2005) (confirming that "a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows" (citation omitted)). In the definition of "original equipment," the term "first purchaser" immediately follows "a motor vehicle," not "a tire."

Third, Thorne's argument would create illogical results. Consider that the Act sometimes regards the maker of a new car as the manufacturer of the car's stock tires. It crafts the following limited definition applicable to, among others, the tire registration subsection: "[A] manufacturer of a motor vehicle in or on which original equipment was installed when delivered to the first purchaser is deemed to be the manufacturer of the equipment." 49 U.S.C. § 30102(b)(1)(G). But Thorne's interpretation of "original equipment" and "first purchaser" would mean that the manufacturer of a tire buyer's vehicle is considered the manufacturer of her replacement tires. Intuitively, and considered against the balance of the statute, such a result is absurd. "A basic principle of statutory construction is that we should avoid a statutory interpretation that leads to absurd results." *In re Kaiser Aluminum Corp.*,

15

456 F.3d 328, 330 (3d Cir. 2006).  We read the Act to more sensibly treat aftermarket tires as "replacement equipment"—"motor vehicle equipment (including a tire) that is not original equipment."  49 U.S.C. § 30102(b)(1)(D).[8]

\*   \*   \*

We conclude that Thorne has not alleged a tangible, economic injury that is sufficient for standing purposes.  She has supported her benefit-of-the-bargain theory of injury with only speculative allegations that the tires she received from Pep Boys were worth less than what she paid for them.  And her argument that unregistered tires are defective such that we may presume standing-worthy economic harm rests on a flawed reading of the Act.  Because we reach this conclusion on de novo review, Thorne's argument that the District Court made erroneous factual findings is of no consequence.[9]  We next

---

[8] Betraying her arguments on appeal, Thorne pleaded that "44 million *original equipment tires for new passenger vehicles* and 201.6 million *replacement tires* for passenger vehicles" were sold in 2013.  Am. Class Act. Compl. ¶ 20 (emphases added).

[9] Thorne also argues that the District Court should not have required her to "'allege any *additional* harm beyond the one Congress has identified.'"  Appellant's Br. 37 (quoting *Spokeo*, 136 S. Ct. at 1549).  That's true as far as it goes.  But the "*additional* harm" admonition "clearly presumes that the putative plaintiff had already suffered a *de facto* injury resulting from the procedural violation."  *Owner-Operator Indep. Drivers Ass'n v. U.S. Dep't of Transp.*, 879 F.3d 339,

analyze Thorne's standing under the *Spokeo* framework governing intangible injuries.

## B. Intangible Yet Concrete Injury

Intangible injuries sometimes qualify as concrete. To determine whether that's the case here, we analyze Thorne's claim to standing by searching for evidence (a) of a close relationship between the lack of tire registration and a harm historically recognized as a basis for common-law suits and (b) that Congress elevated the lack of tire registration to a legally cognizable, concrete injury. *See Spokeo*, 136 S. Ct. at 1549. Our Court has yet to decide whether a plaintiff must prevail on both inquiries, or if demonstrating just one is sufficient. *See, e.g.*, *Susinno v. Work Out World Inc.*, 862 F.3d 346, 351 (3d Cir. 2017) (declining to decide whether intangible injury that does not satisfy both congressional and historical inquiries can be concrete); *Horizon*, 846 F.3d at 637 (suggesting that satisfaction of historical inquiry alone "is likely to be sufficient to satisfy the injury-in-fact element of standing"). Yet we need not reach that question today. Thorne does not have the better of either argument.

1. *No historical analogue*. Thorne alleges two forms of intangible harm: the denial of tire registration assistance in itself, and the materially increased risk of an accident were she unreachable due to the lack of registration upon a recall of her tires. Though precedent does not require us to identify an exact historical analogue that could remedy the alleged harm, "we

343 (D.C. Cir. 2018). As we explain below, because the regulatory violation Thorne alleges is not itself a concrete injury, the language from *Spokeo* gets no traction here. *See Kamal*, 918 F.3d at 115.

17

still require [that] the harm be 'of the same character of previously existing "legally cognizable injuries."'" *Kamal*, 918 F.3d at 114 (quoting *Susinno*, 862 F.3d at 352). Thorne suggests two historical analogues as remedies for her alleged harms: negligence per se and products liability.[10] Neither suggestion is persuasive.[11]

---

[10] Although Thorne tries to draw a historical line to statutory consumer protection actions, statutory actions *ipso facto* fall outside common law.

[11] Thorne contends that she "argued below that her alleged harms bear a close relationship to traditional torts allowing consumers to sue over their purchase of defective products." Appellant's Br. 22 (citing ECF No. 29 at 10–11). But her argument to the District Court was cursory, contending only that "exposure to and harm from dangerous products" was traditionally a basis for suit in English and American courts. ECF No. 29 at 11. Her historical arguments are so fleeting that we could consider them forfeited. *See, e.g.*, *Pa. Dep't of Public Welfare v. U.S. Dep't of Health & Human Servs.*, 101 F.3d 939, 945 (3d Cir. 1996) (holding that argument supported only by "conclusory assertions" in opening and reply brief was waived); *Laborers' Int'l Union of N. Am. v. Foster Wheeler Corp.,* 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief, and for those purposes 'a passing reference to an issue . . . will not suffice . . . .'") (quotation omitted). But we perceive no prejudice to Pep Boys from engaging with the merits of Thorne's undeveloped arguments and, given the countervailing authority, we choose to address them on the merits. *AstenJohnson, Inc. v. Columbia Cas. Co.*, 562 F.3d 213, 223 n.3 (3d Cir. 2009).

As for negligence per se, that doctrine is not a historical recognition of either of Thorne's alleged harms. It merely "establishes, by reference to a statutory scheme, the standard of care appropriate to *the underlying tort*." *In re Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 790 (3d Cir. 1999) (citation omitted) (emphasis added). It permits a fact-finder to consider the violation of a statute or ordinance as evidence of negligence. *Rolick v. Collins Pine Co.*, 975 F.2d 1009, 1015 (3d Cir. 1992), *cert denied*, 507 U.S. 973 (1993). But a plaintiff cannot invoke the doctrine to transform statutory violations into proof of "liability for a separate underlying tort." *Bone Screw*, 193 F.3d at 791 (rejecting argument that "violations themselves form a cause of action"). Nor does negligence per se obviate the need to show proximate causation or damages. *See Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 998 (11th Cir. 2020) (Katsas, J., sitting by designation) (concluding that proffered historical tort analogues had "no relationship to harms traditionally remediable in American or English courts" because plaintiffs "jettison[ed] the bedrock elements of reliance and damages"). Negligence per se might help Thorne prove Pep Boys's breach of a standard of care *if* a tort action would otherwise lie at common law. But it says nothing about that standing-critical "if" question: whether any alleged *harm caused by the breach* could be remedied at common law.

Nor does Thorne's products-liability analogue resonate with us. Though she cites no specific regime, strict liability for defective products (at least in Pennsylvania, where Pep Boys is headquartered and Thorne sued) requires that "physical harm [be] caused to the ultimate user or consumer, or to his property." RESTATEMENT (2D) OF TORTS § 402A, *as adopted*

19

*in Webb v. Zern*, 220 A.2d 853, 854 (Pa. 1966). Without physical harm, neither of Thorne's alleged injuries bears a close relationship to harms that products-liability torts have historically remedied. *Compare Kamal*, 918 F.3d at 114 (determining that FACTA violation did not share close relationship with tort suits for unreasonable publicity or breach of confidence absent "disclosure to a third party"), *with Susinno*, 862 F.3d at 351–52 (noting that Congress "squarely identified" the harm of pre-recorded calls to cell phones and that such harm is "closely relate[d]" to common-law claim for intrusion upon seclusion).

2. *No evidence of Congress elevating either alleged harm.* Congress is "well positioned to identify intangible harms that meet minimum Article III requirements," *Spokeo*, 136 S. Ct. at 1549, so we also consider whether it "expressed an intent to make [the] injury redressable." *Horizon*, 846 F.3d at 637. Thorne maintains that the Act's purpose of preventing accidents and injuries on the roadways validates private actions to enforce the tire registration requirements. The tire registration provisions for independent dealers do not identify their purpose. But what we glean from those provisions and from the statutory regime as a whole persuades us that Congress did not intend to give private attorneys general standing to redress the "injury" of unregistered tires.

First, the titles given to sections of the tire registration regulation and the relevant provision of the Act suggest that their purpose is information-gathering for recordkeeping. The title of a statute and the heading of a section are "tools available for the resolution of [] doubt" about the meaning of a statute. *Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) (quoting *Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 419,

20

528–29 (1947)).  Here, the title of the tire registration regulation is "information requirements," 49 C.F.R. § 574.8, and the enabling statute is titled "[p]roviding information to, and maintaining records on, purchasers."  49 U.S.C. § 30117.  Thorne impugns the District Court's characterization of the regulation as a "procedural record-keeping statute," Appellant's Br. 23, but that description is apt.  Facially, these laws bear no direct relation to the Act's safety purposes.

Second, by connecting its safety goals to vehicle *performance*, the Act as a whole suggests no congressional intent to transmogrify the lack of registered tires into a concrete injury.  In Chapter 301 of Title 49, entitled "Motor Vehicle Safety," Congress recognized the need "to prescribe motor vehicle safety standards" in an effort "to reduce traffic accidents and deaths and injuries resulting from traffic accidents."  49 U.S.C. § 30101; *accord Buzzard v. Roadrunner Trucking, Inc.*, 966 F.2d 777, 781–82 (3d Cir. 1992).  We emphasize that the Act defines "motor vehicle safety standard" as a minimum "performance" standard.  49 U.S.C. § 30102(a)(10).  The definition of "motor vehicle safety" is likewise performance-focused, referring to "design, construction, or performance" of a motor vehicle or motor vehicle equipment.  *Id.* § 30102(a)(9).  Tires that suffer from no performance problems but are simply unregistered do not implicate the Act's purpose.

Third, the Act appears to favor public over private enforcement, both generally and as relevant to tire registration.  It authorizes the Attorney General to sue in federal court to enjoin violations and levy civil penalties ranging from $21,000 to $105 million on those who violate the tire registration section "or a regulation prescribed thereunder."  *See* 49 U.S.C. §§

21

30163(a), 30165(a)(1).  The Act also contains an administrative enforcement scheme under which the Secretary of Transportation "require[s]" dealers to register tires, and may conduct hearings on certain notice-related compliance issues in which "interested person[s]" may participate.  *Id.* §§ 30117(b)(2)(B), 30118(e).  By contrast, the Act is silent on private enforcement of the tire registration regime, only broadly preserving common-law liability for non-compliance with (performance-based) motor vehicle safety standards.[12]  *Id.* § 30103(e).  In fact, this silence may have been purposeful; elsewhere the Act contemplates private-party vindication of rights.  *See, e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another . . . , it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") (quotation omitted).  For example, in the section immediately preceding the tire registration provision, the Act *does* set forth a private cause of action for a distributor or dealer to sue a manufacturer in federal district court over the value of certain parts or equipment.  *Id.* § 30116(c) (establishing statute of limitations and remedies).  If the Act reveals any relevant congressional judgment, it is to prioritize public enforcement over private redress for the "injury" of unregistered tires.

---

[12] The lack of an express private right of action to sue for deficient tire registration, alone, is not what drives our standing analysis.  Even when a plaintiff leverages a duty created by one statute to sue under other laws, an express private right of action in the duty-generating statute is neither necessary nor sufficient for standing.  *See, e.g.*, *Steel Co.*, 523 U.S. at 96 ("[T]he nonexistence of a cause of action was no proper basis for a jurisdictional dismissal.").

Thorne argues that committee reports and a consumer advocate's Congressional testimony exhibit a connection between tire registration and vehicle safety. But those non-statutory data points fail to show that the congressional inquiry favors standing. Viewed at a high level of generality, every provision in a statute will relate to its overarching purpose. The real question is whether the alleged statutory violation is among the concrete harms Congress enacted the law to remedy. *See, e.g.*, *Trichell*, 964 F.3d at 999 ("[T]he harms against which the statute is directed [abusive debt collection] . . . . are a far cry from whatever injury one may suffer from receiving in the mail a misleading communication that fails to mislead.") (internal quotation omitted); *Kamal*, 918 F.3d at 115 ("[T]he FACTA provision [violation of which did not confer standing] was part of Congress's effort to prevent the concrete harm of identity theft."). Congress may have adopted tire registration procedures to decrease the risk of harm to concrete safety interests, but "[a] violation of one of th[ose] procedural requirements may result in no [such concrete] harm." *Spokeo*, 136 S. Ct. at 1550; *see also Kamal*, 918 F.3d at 117. The Act gives us no reason to conclude—but does provide reason to doubt—that Congress elevated the lack of tire registration into an injury that is concrete for Article III purposes.

*     *     *

Given the attenuation between lack of tire registration and the Act's purpose of reducing accidents, deaths, and injuries, only a definitive congressional judgment to elevate the former into a concrete injury would favor Article III standing under *Spokeo*'s congressional inquiry. Thorne points to nothing that would aid her cause. In fact, the statute's titles, defined terms, and enforcement provisions suggest the opposite.

23

### C. Speculative Injury

Even were we to assume that Thorne's alleged injury *is* sufficiently concrete, we must still address the third prong of injury-in-fact analysis—whether an alleged harm, even if concrete, is hypothetical or conjectural. *Spokeo*, 136 S. Ct. at 1548; *Johnson & Johnson*, 903 F.3d at 284. This element is intended to weed out claims that are nothing "more than an ingenious academic exercise in the conceivable." *United States v. Students Challenging Reg. Agency Procs. (SCRAP)*, 412 U.S. 669, 688–89 (1973); *see also Cottrell v. Alcon Labs.*, 874 F.3d 154, 168 (3d Cir. 2017).

Only Thorne's second alleged injury—an increased risk of harm to property or person if her unregistered tires are recalled—fits within this framework. To be sure, a "risk of real harm" may "satisfy the requirement of concreteness." *Spokeo*, 136 S. Ct. at 1549. But the "threatened injury must be certainly impending to constitute injury in fact." *Clapper*, 568 U.S. at 409. And there must be at least a "'substantial risk' that the harm will occur." *Id.* at 414 n.5 (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 153–54 (2010)). Thorne posits only an infinitesimal increase in her chances of being injured because of Pep Boys's failure to register her tires, so any risk of harm—even if concrete—is no more than speculative.

In Thorne's telling, Pep Boys's failure to register her tires increased her risk of harm because, if the tire manufacturer recalls her tires, it will be unable to contact her. That, she contends, could lead to her continuing to drive on the recalled tires and having an accident attributable to the defect that prompted the recall. But, as in *Kamal*, this threat consists of a

24

highly speculative chain of future events that does not constitute a material risk of harm. 918 F.3d at 116. For the threatened harm to transpire, the following independent events would need to occur:

1) The manufacturer discovers that a collection of tires, a subset of which Thorne bought from Pep Boys, contains a defect able to cause property damage or personal injury.

2) The manufacturer recalls the tires.

3) Thorne is still driving on the tires at the time of recall.

4) Thorne is otherwise still reachable from the information that should have been recorded on the registration form at the time of purchase.

5) Pep Boys, upon learning of the recall, does not supply the manufacturer with Thorne's contact information.

6) Thorne does not learn of the recall through other channels, such as media or consumer reports.

7) The defect prompting the recall causes Thorne to have an accident.

25

This threatened injury is not "certainly impending," nor does it present a "substantial risk." *Clapper*, 568 U.S. at 409, 414 n.5. This chain of conceivable events poses some new non-zero risk to Thorne, but her absolute chances of harm are miniscule. *See Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1621 (2020) (citing *Clapper* for proposition that challenged act must have "substantially increased the risk" of harm to plaintiff). In other words, relative increase cannot be the measuring stick because whenever the plaintiff was at zero risk before the defendant acted, the percentage increase in her chances of harm is "infinite." *Trichell*, 964 F.3d at 1001 n.4. Without announcing where in the logical chain a concrete injury becomes too attenuated, we conclude that Thorne's alleged "'at-risk' . . . status" is too speculative to support standing. *Perelman v. Perelman*, 793 F.3d 368, 375 (3d Cir. 2015) (no standing to sue over risk of default on retirement obligations where plan's assets exceeded liabilities under accepted accounting method).

The authority Thorne musters does not compel a different conclusion. In *DiNaples v. MRS BPO, LLC*, 934 F.3d 275 (3d Cir. 2019), the defendant allegedly violated the Fair Debt Collection Practices Act (FDCPA) by printing on the outside of a debt collection letter a Quick Response code that, when scanned, revealed the plaintiff's account number. *Id.* at 278. We rejected the argument that a third party would first have to access and understand the disclosed information before the plaintiff could have standing. The FDCPA takes aim at the harm of privacy violations, and the chain of future events that would produce that harm only required one step: a third party scanning the code. For Thorne's future injury to occur, by contrast, up to seven steps must be daisy chained.

26

Nor do our data breach and privacy cases assist Thorne. *Horizon* dealt with the plaintiffs' standing to sue Horizon under the Fair Credit Reporting Act (FCRA) after unencrypted laptops containing their personal information were stolen from one of the company's facilities. 846 F.3d at 632. Congress in the FCRA identified as a cognizable injury unauthorized dissemination of personal information—harm closely related to invasion of privacy, which traditionally was a basis for a common-law suit.[13] *Id.* at 639–40. Rejecting the argument that the harm was too speculative, the *Horizon* court noted that "[t]he theft appears to have been directed towards the acquisition of such personal information," the laptops were unencrypted, and one plaintiff had been a victim of identity theft as a result of the breach. *Id.* at 639 n.19. *Horizon*, in which a malicious actor accessed the plaintiffs' protected personal information and committed identity theft, is a far cry from the case before us.

Similarly unavailing is *Long v. Se. Penn. Transp. Auth.*, 903 F.3d 312 (3d Cir. 2018). The *Long* plaintiffs alleged that the defendant, first, did not send them copies of their background checks before deciding not to hire them based on those background checks and, second, did not send them notices of their rights under the FCRA. *Id.* at 317. We held that the first

---

[13] *St. Pierre v. Retrieval-Masters Creditors Bureau, Inc.*, 898 F.3d 351 (3d Cir. 2018), which Thorne's counsel cited at oral argument, has no purchase here for similar reasons. *See id.* at 357–58 (holding that exposure of plaintiff's credit account number through envelope window of debt collection letter "'implicate[d] a core concern animating the FDCPA—the invasion of privacy'—and thus [wa]s closely related to" a traditional harm).

27

alleged harm was sufficiently concrete: Suffering adverse employment action without the required consumer report was the very harm that Congress sought to prevent, and interference with the plaintiffs' ability to control their personal information was analogous to common-law invasion of privacy. *Id.* at 323–24. But the second alleged injury—lack of FCRA-required notice—was a bare procedural violation for which there was no standing. *Id.* at 325. We rejected the argument that the violation increased the risk that the plaintiffs' claims would lapse before they could sue. *Id.* Thorne's alleged harm from unregistered tires resembles the *Long* plaintiffs' second claimed injury much more than their first.

Finally, we acknowledge *Exum*'s decision that tire purchasers had Article III standing to sue for a dealer's failure to comply with the tire registration requirement. But the *Exum* opinion does not consider the level of attenuation in the logical chain from the lack of tire registration to property damage or a human toll. Instead, the judge's analysis ended with the determination that lack of tire registration increased the risk that a manufacturer would be unable to contact the owner of an unregistered tire about a recall. 437 F. Supp. 3d at 1151. But nothing in the Act suggests that the relevant congressional interest is contact with a tire owner. Instead, Congress was concerned with safe design, operation, and performance of motor vehicles. *Exum*'s rationale is unpersuasive.

\* \* \*

If Pep Boys shirked its tire registration obligations, it committed only a "bare procedural violation" that caused neither actual harm nor a concrete material risk of harm. Even if Thorne's alleged harm associated with a future recall of her

28

tires were concrete, her risk of actual injury is too speculative for Article III standing purposes. Thorne's allegations fail to establish an injury in fact, and so the District Court lacked jurisdiction over her claims for money damages.

### D. Other Remedies

Thorne also sought "equitable relief including restitution and/or disgorgement" of revenues and profits Pep Boys obtained through its conduct. Am. Class Act. Compl. ¶ 113. And she requested injunctive relief to "prevent[] Defendant from selling unregistered tires or tires without registering those tires with the manufacturer or providing registration cards to consumers." Am. Class Act. Compl. ¶ 136. Thorne arguably forfeited her standing to seek those remedies because she presented only arguments in support of money damages. *See supra* note 11. Yet her operative complaint does allege facts targeted at restitution and injunctive relief, so we will consider her standing *vel non* for these remedies on the merits. *Mielo*, 897 F.3d at 479. Because *Johnson & Johnson* is instructive, and we see no need to reinvent the wheel, we conclude that Thorne again lacks standing.

1. *No standing to seek restitution or disgorgement.* Assuming Thorne can seek these remedies when she herself suffered no financial loss, the allegations supporting her request for restitution are conclusory and hinge on mere conjecture. She alleges that Pep Boys ignores its tire registration obligations to spend more time selling tires and is unjustly enriched by sales made during "the time it would have taken to register Class Members' tires." Am. Class Act. Compl. ¶ 8; *accord id.* ¶¶ 46, 103, 108–13. But standing doesn't flow from

29

mere suspicion that a defendant made more money by allegedly shirking a legal obligation. To take just one example, the *Johnson & Johnson* plaintiff premised her restitution claim on allegations that the defendant managed to sell more baby powder than it would have had it properly informed consumers about the safety risks. 903 F.3d at 291. We saw no standing for two reasons that obtain here as well. First, the plaintiff failed to allege facts that would permit the conclusion that Johnson & Johnson made more sales than it would have. 903 F.3d at 292. That's also true of Thorne's allegations insofar as they offer nothing to ground her suspicion of ill-gotten gains, such as how long it would take Pep Boys to provide the required tire registration service relative to the total time required to consummate a tire sale. Second, both there and here, the plaintiff's theory of restitution belies her willingness, or the willingness of others, to buy the product despite awareness of the alleged risks. *Id.* at 291 & n.18; *see* Am. Class Act. Compl. ¶ 134 ("Plaintiff and the Class members will likely purchase tires from Defendant again or have the tires serviced, and still not receive the required tire-registration services."). We determine that Thorne lacks standing to seek restitution or disgorgement.

2. *No standing to seek injunctive relief.* Thorne premised her plea for injunctive relief on her allegation that she and other putative class members will purchase tires at Pep Boys again without receiving the required tire registration assistance. But we must "afford[] [Thorne] the dignity of assuming that she acts rationally, and that she will not act in such a way that she will again suffer the same alleged 'injury.'" *See Johnson & Johnson*, 903 F.3d at 293. "Pleading a lack of self-restraint may elicit sympathy but it will not typically invoke the jurisdiction of a federal court." *McNair v. Synapse Grp.*

30

*Inc.*, 672 F.3d 213, 225 n.13 (3d Cir. 2012). Because her allegations reveal that she knows of Pep Boys's practices, Thorne's request for injunctive relief amounts to a "'stop me before I buy again' claim" that precludes Article III standing. *Johnson & Johnson*, 903 F.3d at 292–93. We thus conclude that Thorne lacks standing to seek injunctive relief.

### E. Dismissal

One final matter warrants our attention. The District Court dismissed Thorne's original complaint without prejudice, while dismissing her amended complaint "without leave to amend." JA16 & n.2. That disposition was incorrect. Dismissal for lack of standing reflects a lack of jurisdiction, so dismissal of Thorne's amended complaint should have been without prejudice. *See, e.g.*, *Kamal*, 918 F.3d at 119 (vacating with-prejudice dismissal of amended complaint and remanding for without-prejudice dismissal); *Cottrell*, 874 F.3d at 164 n.7 ("Because the absence of standing leaves the court without subject matter jurisdiction to reach a decision on the merits, dismissals 'with prejudice' for lack of standing are generally improper.") (citing *Korvettes, Inc. v. Brous*, 617 F.2d 1021, 1024 (3d Cir. 1980).

Pep Boys is wary of Thorne filing more standing-free complaints, but we have no reason to question the professionalism or good faith of Thorne's counsel. And, of course, Federal Rule of Civil Procedure 11 always serves as a check against abuse of the litigation process. The specter of serial litigation cannot imbue the District Court with jurisdiction it otherwise lacks.

## V. CONCLUSION

Thorne has no tangible, concrete injury because she hasn't specified how to value her alleged harm, why the tires she received were worth less than she paid for them, or how non-compliant tires are defective under the Act. Nor has she met the Article III standing requirements for intangible, concrete harms. Thorne hasn't shown a common-law analogue to either of her alleged harms. And neither the Act nor applicable standing caselaw suggests that Congress intended to repose authority in private attorneys general to enforce the tire registration regime. Even if Thorne could show an intangible but concrete injury, the chain of events necessary for any harm to materialize is speculative.

While we uphold the reasoning of the District Court in dismissing Thorne's operative complaint, we will vacate and remand for a without-prejudice dismissal.